Good morning, everyone. This is Judge Sykes. Welcome to our argument session today via Zoom. Our first case this morning is MBM Holdings v. City of Glendale. Ms. Petzner, there you are. Good morning, Your Honor. Good morning. Can you hear me? I can hear you. Can you hear me? Yes, I can, and I believe everyone else is nodding. You may proceed. Thank you, Your Honor, Your Honors. Good morning. My name is Amy Petzner. I represent plaintiffs, appellants, Brett Uhlberg, and MBM Holdings. May it please the Court. Colin Johnson was the building inspector for the City of Glendale for 13 years. Over that time, he built a reputation as unforgiving on the city's building code. This generated complaints from citizens and elected officials over time to such an extent that the city tried to end his employment in 2016. After this was unsuccessful, Johnson was allowed to return to his job and continue on without any conditions placed on his employment or any attempts to reform his behavior. I'm going to stop you because there's not all that much time. Ms. Petzner, there are some questions here, so thank you. In terms of a property interest, okay, to the extent we're talking about the inability to occupy the building, in what way and at what point in the chronology did Mr. Johnson or the city become responsible for the delay? I gather there's no dispute that at least some repairs were necessary. And although there was obviously a disagreement between the parties as to the scope of repair, there were ongoing meetings, there were ongoing communications on this point. And eventually, the city accepted the more limited set of repairs that Mr. Uhlberg's inspector proposed. So in what sense were the defendants at fault in terms of resolving the necessary repairs and then permitting occupancy? I would submit that they were responsible once the occupancy, once the application for the occupancy permit was submitted, that at that point it was the city, at least under its existing policy, that it dictated the process. And that occurred in September of 2017. And at that point, it was the city's responsibility. And I would say, obviously, there were some things that Mr. Uhlberg had to do. It's not apparent from the record whether that was limited to the repairs that he had proposed from his expert. In fact, he wasn't given any sort of explanation about why there was the delay in that time, if it was due to him or if it was due to other circumstances at the city. Well, but tell me this, what, if anything, did Mr. Uhlberg lose vis-a-vis his lease agreement with Ms. Gardner, given that the lease placed the onus on her to make the necessary repairs to the building? Well, pursuant to the raise order and state statute, he was unable to collect any rents for as long as the raise order was in effect. Otherwise, he would have been subjected to fines and possible imprisonment. In addition, he did not feel like he did not collect any rents from her, except for, I believe, an initial deposit and then the catch-up deposit amounting to $11,000. So that would be the rents, the rental loss would have, was substantial. And if he had been able to, or if she had been able to resume her occupancy at an earlier time, at a reasonable time, and, you know, after having been heard and allowed to address any concerns by the city, he would not have suffered those damages. In addition to which, he did suffer damages as well because of the expense that he had to go through in order to, first of all, discern what it was that the city was going to require of him to first avoid the raising of his building, as well as the resumption of the occupancy of the building. Ms. Hetzner, I have a sort of a prior question, which is procedural in nature. Mr. Nash did not plead a due process claim, either a substantive due process claim or a procedural due process claim, nor did he brief at summary judgment a due process claim, either procedural or substantive. There was discussion of an equal protection claim, apparently in the nature of a class of one equal protection claim at the summary judgment stage, and there was a mention of an equal protection violation in the complaint, but no due process claim. Judge Stantmiller struggled to identify the claims that were actually being raised in this case, either in the complaint or in the summary judgment briefing, and very generously constructed a due process argument here in his decision, entering summary judgment for the defendants. But I'm not sure we need to be that generous here. You didn't raise a due process claim in the district court. You didn't brief a due process claim in the district court. On appeal, you're not challenging the ruling against you on the equal protection claim. So what do we have left? Well, I do believe that a due process claim was raised. As pointed out in the brief, there is no displeading as well as there is an allowance in the rules for development of claims through the discovery process. The defendants, appellees in this case, were clearly on notice that Mr. Yuleberg and MBM Holdings had raised due process because they briefed it in their original motion. And as you noted, the court did consider it and did consider the arguments. I need to push back on that a little bit because the generosity of your opponent and the generosity of the district court does not excuse a plaintiff's failure to develop a coherent legal theory for the case. And I reviewed the briefing in the district court. I've reviewed the complaint, and the complaint does not allege any due process claim, nor does the briefing in the district court develop any coherent due process claim. And as far as I'm concerned, that's the end of the due process claim. You haven't challenged the ruling on the equal protection claim. So, you know, this is not a complicated question about identifying what the particular property interest is and what procedures were due or whether there was some sort of irrationality to the building inspector's actions here or the city's actions. I would just submit to that that if the defendant's appellees had concerns about the nature of the claims that were being brought against them and their inability to understand those claims, then they should have made a motion for a more definite statement and permitted the plaintiff's appellants to reform their pleadings in order to. There's no necessity that the defense, make that sort of motion, the defense can rely on waiver by simply pointing out the failure to develop an argument, and they, the defense can make an argument that the claim, to the extent that one can be teased out of the I dare say a coherent argument in the district court. I would briefing on appeal is a little better, but in the district court, it was substandard. I would just, I would just submit that if the defendants are going to argue waiver, then they should have done so at the district court level. They should not brief, brief it fully at the district court level and wait until it's up on appeal before raising the idea of waiver so that it could be addressed before the district court. At that time, it was not the district court did address the arguments and here we are. True, but Judge Stattmiller made it clear that the briefing was inadequate and bent over backward to construct an argument for the plaintiff's lawsuit here. So, you know, there hasn't been a waiver of waiver, if that's what your argument is. Waiver is asserted here and is an adequate basis for a summary affirmance. I guess I would just argue that if you believe based on the briefing that the plaintiff's appellants have the raised a genuine issue of material fact regarding substantive due process and procedural due process based on the evidence that was presented to the district court, then the plaintiff's appellants should not suffer because of any sort of briefing deficiencies by the trial court attorney. Why not? Because if they do have a case, then I believe that they have the right to take that case to a jury if they've raised a factual issue. That's actually wrong. We enforce rules of waiver. Well, and you also waive rules of waiver and it's an issue of discretion for this court to exercise when you do believe that the facts of the case justify not considering an argument to be waived. So, you're asking us to rescue the case from the poor briefing in the district court. I'm asking you to consider the issues that were considered by the district court and the facts and the evidence that were presented at the district court level in which I believe support the procedural and substantive due process violations, at least that there's a genuine issue of material fact that is raised by the evidence that has been presented thus far in the trial court. I think that we've laid out that there were pretty severe violations against the Mr. Holdings that there was a notice that was given to the city that the actions of their building inspector would lead to the violations that did occur in this case. And I believe that based on that evidence that Mr. Yulberg and MBM Holdings should be allowed to proceed with the case and that the district court aired when it granted summary judgment and dismissed his claims. Ms. Hetzner, this is Judge Faulk. Against the backdrop of Chief Judge Sykes' questions, what would be your response to the argument that there are alternative state remedies available to Mr. Yulberg? My argument would be that the state remedies that were pointed out in Wisconsin 66.0413 are wholly inadequate and do not provide any sort of post deprivation remedy for the damages that he suffered. The only thing that 66.0413 provides is a restraining order for the raising of a building. It does not provide him a way to be compensated for the damages that he suffered due to the loss of rent and the occupancy. It does not give him a remedy for permitting him to shorten the time or expedite the process for the issuance of the occupancy permit. So I don't believe that the state remedies in this case prevent the assertion of the constitutional violations. You know, it seems as if the notice was specific enough to allow Mr. Yulberg to engage an inspector or a contractor to determine what repairs were necessary. And of course, that's what Mr. Yulberg eventually did do. And he managed to convince the city to accept his inspectors much more modest assessment of the scope of repairs necessary. That may be true, Your Honor. However, the notice did not comply with 66.0413, which requires that you actually specify the repairs that need to be made. And the notice said that there were general deficiencies in a number of broad areas, some of which turned out not to be true. Mr. Yulberg had to hire his own expert inspector to do a completely independent review. He did review it somewhat against the sparse notice that was given as part of the race order. Forgive me, but, you know, Mr. Yulberg almost seems to suggest that the city has to act as a contractor would and propose a specific set of repairs. I'm not certain I understand where that obligation would come from. The notice identified the 11 areas of concern and Mr. Yulberg's inspector was able to conduct an evaluation and propose a set of repairs that the city deemed adequate. So what I've been trying to figure out is in what sense Mr. Yulberg was deprived of the information that he needed to respond to the notice. Well, first of all, he was doing so under the threat of the raising of the building. There was no sort of protection that was given that he'd be able to avoid that. And I think that, again, the fact that the city didn't comply with its own race order doesn't necessarily mean that that Mr. Yulberg wasn't damaged in this case and that his rights weren't violated. I can't get to what sort of process he was denied. The notice gave him an initial period of 90 days to take action. And in practice, the notice commenced a series of meetings and exchanges between the city and Mr. Yulberg, which eventually resulted in a mutually agreeable resolution of the city's concerns. So what process was missing? It took a while, but these things do. Well, I'd first dispute that it was mutually agreeable because I don't believe that Mr. Yulberg or MBM Holdings were satisfied with the process or the result, the effect of which was the denial of the use of the building for an 18-month time period. As for whether or not these things take time, that may be true, but the fact that the city did not take time before issuing a raise order and threatening Mr. Yulberg with the loss of the building, threatening him with fines for renting or occupying the building, and also delaying this process, was not justified and frankly was rash under the circumstances as they came to light, that there was no basis for this sort of order to be issued in the first place. The extent of the repairs that were documented should never have resulted in Mr. Yulberg to be threatened with fines and imprisonment for renting out the building or for the potential loss of his building in the long run and what instigated him having to rack up so much money and fees and getting his own inspectors and assessments of the cost of repairs in order to get the raise order lifted. All right, Ms. Heffner, your time has expired. Thank you, Your Honors. Ms. Boehner. Go ahead, Ms. Boehner, whenever you're ready. May it please the court, my name is Jasmine Boehner and I represent the defendant appellees, the city of Glendale and Mr. Colin Johnson. The appellees have respectfully asked this court to affirm the district court's decision, granting them summary judgment and dismissing plaintiff's claims in their entirety. I think the justices have hit the nail on the head when it comes to the waiver of the due process argument, so I won't labor that point, but the second point would be I forgive me, but I will add that Judge Stadtmuller wasn't so happy with the defendant's briefing below either. Yes, Your Honor, and I guess the issue that we had when trying to interpret the case, Mr. Uhlberg pled an equal protection claim. During his deposition, he was asked, you know, the basis for that claim, and he indicated that he believed that his property was treated in a manner different to similarly situated property owners. After the close of discovery, it was determined that there was actually no comparable property owners. So whether or not, I guess we could have filed a motion for a more definite statement, but we believe through our discovery that the claim that Mr. Uhlberg was making was that his building was unfairly issued a building code violation when other such buildings were not. Well, you know, it does raise an eyebrow that whereas Mr. Johnson estimated it would take 130,000 or more to repair the building. In the end, it only took about 16,000. Do you think a fact finder could infer that the decision to issue the notice to repair or raise the building was reckless under those circumstances? And I would submit that the estimate, so just for clarification of the record, there was actually two inspections that occurred. One was ordered by Miss Gardner in January of 2019, and that was by Al Walters, and that inspection report actually highlighted many of the deficiencies that Mr. Johnson found. That January report was never given to the city until April when Mr. Uhlberg had a second inspection done by a residential home inspector, not a commercial dwelling inspector, and his residential home inspector came to the conclusion that the building would cost somewhere around $25,000 to bring it up to code. I mean, it's our opinion that that estimate was just disingenuous. If you look at the photos that were documented during Mr. Johnson's inspections, there was multiple rotting windows, multiple electrical failures. But how could it be disingenuous if 16,000 did it? I mean, you know, that's 9,000 less. And so I will submit that that was just an estimate. During the deposition, I asked Mr. Uhlberg, I said, that sounds like a great estimate. Did you have that work completed? And he indicated that it was Charisse's building, so I'm not sure if that estimate was ever accepted and that work was ever done. I am aware that the next year, over a year later in January, the roof still had problems, there were still structural issues, and Ms. Gardner was still paying sums to get the building into compliance. So whether or not that estimated repairs or that company workhorse was ever used, it was unclear to me and it was unclear to Mr. Uhlberg. Well, then how did you, how did it, how are you where you are today if you don't know if these things were done or weren't done and there's stuff to be done? And it sounds so slipshod. So I guess- On the city's part. And so I will, so what, basically what happens when you, you know, this building sits in the middle of town, there's not, until somebody applies for, you know, the inspector doesn't just inspect random buildings all the time. The inspections on this building started because Mr. Uhlberg had purchased the building and the building inspector drove past and saw somebody using it as a woodworking shop with the garage open. So when he stopped in and asked, you know, what's going on, that prompted these inspections. The inspections that he had and that the North Shore Fire Department had turned up all of these concerns. However, the city wanted to work with Ms. Gardner, and they did so, and they worked with her over the next couple of months through the next year to get this building up to code. And her commercial occupancy application that she submitted indicates that, you know, once you submit this, it's your responsibility to ask the city to come back and re-inspect and to ask the fire department to come back and re-inspect. So that's kind of where the city was at. There were some repairs made. However, those repairs were all made without permits. If you just put an addition onto your house and you don't notify the city and it's done without a permit, the city has no knowledge of, well, maybe they did fix the roof. Well, it was done without a permit, so the city had no knowledge of any type of, I guess, improvements that were being made, if that makes sense. Do we even need to wallow around in the facts in this case? To the extent that there is a procedural due process claim lurking somewhere under the surface here, isn't the material point that the state remedy for a rainwater are robust and were readily available to Mr. You can go to court to get judicial review of a raise order. There's an automatic TRO, so you halt any damages that may be occurring as a consequence of the issuance of a bad rainwater and you challenge it that way. And so the state provides more than adequate, ample, robust post-deprivation remedies, and he didn't invoke them, so end of case. And I would agree with you. I think that is a pretty big threshold dispositive issue of this case. And I think that's been established, and to that point, I have nothing further to add, but I'm more than willing to answer additional questions if need be. Well, and to the extent we're going to wallow around in the facts, let me tell you my take of the facts, and you can correct me if you think it's wrong. What we have here is a very sort of strict building inspector in the city of Glendale. We've got municipal officials, the city manager, the common council that want to work with homeowners to bring properties up to code. So there's this sort of turf warfare going on in the city. Mr. Uhlberg buys a dilapidated property and puts the onus on his tenant to fix it up and then gets angry when he gets caught in this power struggle between the very strict building inspector and the political officials in the city of Glendale. And instead of using his state remedies to contest the raise order, he makes a federal case out of it. Is there anything wrong with that understanding of the facts here? No, I think you have summarized the case exactly. And, you know, we concede that Mr. Johnson was overzealous in the building code enforcement, but that's not illegal and it's not unconstitutional. And that's pretty much where our argument, you know, where I think plaintiff's argument ends. But I think your summary of the facts really hits the nail on the head. Are there any other questions for Miss Baynard? Seeing none. Thank you. And Miss Hetzner, your time had expired. If you have something to say in rebuttal, I'll give you a minute to rebut. Thank you, Your Honor. Just briefly, you had mentioned that you believe that the post deprivation remedies provided by 66.0413 are robust. I would again point out that Mr. Uhlberg did allege that he suffered economic damages, which are not provided for under the statute. And therefore, we do not believe that the remedies provided under 66.0413 are robust. The city also provides for an automatic, the statutory scheme provides for an automatic TRO once judicial review is filed, which would arrest any damages. So to the extent that he suffered damages during the pendency of this raise order before it was rescinded, he had an opportunity and a remedy under state law to reduce those economic damages by going to court and getting the TRO. Well, I would also point out that the city has disputed that the raise order was even a raise order, and that would raise questions about whether that particular remedy would have been available. That doesn't matter. The question is, if the remedies existed, and they are legally sufficient, that's the end of the procedural due process claim. I would also point out that the council characterized Mr. Johnson's actions as overzealous, but not unconstitutional. And I would just disagree with that, that the strict enforcement of building codes that interferes with property owners' property rights is unconstitutional, whether or not the building codes are valid or not. There was, in the record, an indication that he had interfered with the sale of the mayor's home to another private citizen because of a building code violation, which I've never heard of before. What made politicians mad? Well, I've never heard of a building inspector who decides to insert himself in a sale of property. That's rather unique, and I think kind of predicting of where things were going with this particular gentleman. And for those reasons, we do believe that the district court's decision granting summary judgment and dismissing Mr. Uhlberg's claims for violations of procedural and substantive due process should be reversed. The district court's decision dismissing the city from liability for his actions should also be reversed, and this case should be remanded to the district court for further proceedings. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement.